Filed 9/30/24  In re Z.L. CA2/1

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Z.L., <br><br> a Person Coming Under the Juvenile Court Law. | B334307 <br><br> (Los Angeles County Super. Ct. No. 23LJJP00251) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.L., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debra L. Gonzales, Judge Pro Tempore. Affirmed.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

Respondent Los Angeles County Department of Children and Family Service (DCFS) filed a petition under Welfare and Institutions Code[1] section 300 seeking to have the juvenile court assume jurisdiction over Z.L. (born 2014). DCFS based the petition on Z.L.'s mother S.L. (Mother) leaving Z.L. and her younger siblings for an extended period of days with a friend who hit the children and used drugs in their presence while caring for them. Feeling unsafe, the children ran away from the friend's house, and were found walking (some, including Z.L., without shoes) along a freeway in the desert in approximately 100-degree heat.

The juvenile court found that Z.L. was a child described in section 300 and declared her a dependent of the court. In asserting jurisdiction over Z.L., the court found there was a substantial risk that she would suffer serious physical harm as the result of not being adequately supervised and protected by Mother and Bernadette A., Z.L.'s maternal grandmother (MGM), who had been the child's legal guardian for more than six years.

Mother appeals, contending there is no substantial evidence supporting the court's assertion of jurisdiction over Z.L.

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

2

DCFS contends that Mother lacks standing to appeal because MGM was and is Z.L.'s legal guardian. We reject this contention because Mother has an interest in protecting her parental rights, which are merely suspended during the guardianship but could possibly be permanently terminated in the dependency proceedings.

As to the merits of Mother's appeal, we conclude that substantial evidence supports the juvenile court's jurisdictional findings, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Family

In July 2023, Mother and her four children—Z.L., son J.W. (born 2016), daughter A.L. (born 2019), and daughter Sa.L. (born 2020)—lived with MGM. Mother reported that L.W. (Father) was the father of Z.L., J.W., and A.L., and that J.R. was the father of Sa.L. Neither Father nor J.R. participated in the dependency proceedings prior to the jurisdiction hearing at issue, and neither is a party to this appeal.

### B. DCFS History

#### 1. *Guardianship*

According to DCFS, Mother had been a regional center client as a child and was "noted to be intellectually challenged." At some unknown time before Mother was involved in dependency proceedings in 2017, MGM became Z.L's legal guardian pursuant to a probate court proceeding.

#### 2. *2017 Dependency Proceeding*

The juvenile court found that Z.L. was a child described in section 300 in August 2017, as a result of Mother and Father engaging in a violent altercation while Z.L. was in the home.

MGM was found to have failed to protect Z.L. by allowing Mother and Father unlimited access to the child despite knowing of their history of domestic violence. The juvenile court thereafter placed Z.L. and MGM (as MGM was Z.L.'s legal guardian) on a program of supervision by DCFS pursuant to section 360, subdivision (b).[2]

3.     *The Children Are Found Walking Along a Freeway Unsupervised in Approximately 100-degree Heat*

On Sunday, July 23, 2023, DCFS received a referral that a sheriff's deputy responding to calls by concerned citizens had found Z.L., her siblings, and a girl named Charlene W. walking unsupervised along a freeway in the desert on a hot day. The children were only partially dressed, and some had no shoes. At around 4:30 p.m. that day, a social worker spoke with the deputy, who reported that he had found the children at around 11:49 a.m., the children were still with him, the children did not know their parents' whereabouts, their address, their telephone number, or their last names, and no one had reported the children missing.

That evening, the social worker interviewed A.L. and Sa.L. at the sheriff's station. Both children's hair was matted, their faces, hands, and feet were dirty, they were not wearing any underwear, and their clothing was ill-fitting. A.L. reported she did not know where her parents were, and that she had been

---

[2] Section 360, subdivision (b) provides that, if the court finds a child is a person described by section 300, "it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker" for a limited period of time.

staying with Charlene W.'s mother, Monique G.,[3] but could not say for how long. According to A.L., she and her siblings ran away from Monique G.'s house because they did not want to be there. The social worker learned of Mother's address and drove there with A.L. and Sa.L.; the social worker honked the horn, called out to Mother, and called Mother on the phone, but was unable to contact her.

Later that evening, the social worker interviewed Z.L., J.W., and Charlene W. at a medical clinic. Z.L.'s clothes were dirty and ill-fitting, she was not wearing any shoes or underwear, and her hair was matted. Z.L. reported that she and her siblings had been at Monique G.'s house for two weeks and she did not know when Mother was going to return. According to Z.L., the children ran away from the house because Monique G. had hit them several times all over their bodies and Z.L. did not feel safe. She stated that Monique G. was selling marijuana which she kept in a white bag, and she and her boyfriend Greg smoked white rocks in a glass pipe.

J.W. had dirty, ill-fitting clothes and dirty shoes, and was not wearing underwear. He stated that he and his siblings had been at Monique G.'s house for two days and did not know when Mother would come back for them. J.W. also stated that he and his siblings ran away because Monique G. hit them.

Charlene W., then aged five, stated that the other children had been staying with her mother (Monique G.) for the past couple of days. She initially confirmed that her mother had hit

_____

[3] The children knew and referred to Monique G. by a nickname. For the reader's convenience, we refer to Monique G. by her given name.

5

Z.L. and the other children, but then denied it.  She reported that her mother sells "weed" and also keeps drugs for herself.  Charlene initially confirmed that her mother smokes from a glass pipe, but then denied it.

4.      *DCFS Interviews Monique G. and Mother*

At 12:30 a.m. (on July 24), the social worker spoke with Monique G. over the phone.  Monique G. reported she had been taking care of Z.L. and her siblings for the past two days but had not heard from Mother.  According to Monique G., the children left the home while she was asleep during the daytime.  When she woke up at 6:00 p.m., Greg told her the children were asleep in their room.  Monique G. could not say when she noticed the children were missing or explain why she had not immediately called the police when she did make the discovery.  Monique G. denied that she sold marijuana or used illicit drugs.

That evening, the social worker spoke with Mother twice over the phone.  Mother indicated she asked Monique G. to watch the children for two days because she was having her house painted and MGM and a maternal aunt were not available to take care of the children.  She had known Monique G. for a year, having met through a mutual friend.

According to Mother, she dropped off the children at Monique G.'s house that Friday and called Monique G. on Sunday at 6:00 p.m. to announce she was going to pick the children up.  That was when Monique G. told her the children were missing.  Mother then went to Monique G.'s house and searched the neighborhood.  Mother called 911 twice, and during the second call learned that the children had been picked up by DCFS.  Mother did not contact DCFS until 10:00 a.m. the next day, and

6

claimed the delay was because she became distraught and then slept in her car.

Mother denied knowing that Monique G. was hitting the children or using and selling drugs. Mother stated this was the first time she had asked Monique G. to care for the children.

### 5. *DCFS Attempts to Contact MGM*

On Tuesday (July 25), the social worker attempted to contact MGM, but was only able to speak with Mother, who reported that MGM lived in the same home with Mother and the children. MGM did not respond to DCFS's effort to speak with her.

## C. Petition and Detention

On July 25, 2023, DCFS filed a section 300 petition on behalf of Z.L. alleging that MGM, as Z.L.'s legal guardian, "made an inappropriate plan of care for the child resulting in the child being in the care of [M]other," who, in turn, "made an inappropriate plan of care for the child" by leaving Z.L. with Monique G., who exposed Z.L. to drugs and struck her repeatedly, causing Z.L. to run away from Monique G.'s home and walk on the side of a freeway in the desert in 101 degrees heat without shoes. DCFS asserted claims under subdivision (b)(1)(A) of section 300 based on MGM's and Mother's alleged inability or failure to supervise or protect Z.L., and a claim under subdivision (j) of section 300 based on Mother's endangering Z.L.'s siblings by leaving them with Monique G.

The juvenile court held a detention hearing on July 26, 2023. MGM appeared; Mother and Father did not. MGM, through her counsel, denied the allegations. Counsel indicated that MGM "was under the impression that [Z.L.] was having an extended sleepover with her siblings and [M]other at [Monique

7

G.]'s home." According to counsel, MGM had spent time with Monique G. and "had no indication or reason to know that allowing [Z.L.] to spend time at Monique[ G.]'s home would be problematic." Counsel stated that MGM and Z.L. lived together with Mother and the other children, and MGM "has made a habit of allowing [Z.L.] to join Mother and her siblings because [Z.L.] is distraught when [MGM] does not allow her to do so and there have been no safety concerns up to this point." Counsel represented that MGM was "ready to exclude [Mother] . . . from the family home which is solely in [MGM]'s name . . . so that Mother can get the help she needs and [Z.L.] could return to [MGM]'s care."

The court found a prima facie case that Z.L. was a child described in section 300. The court ordered Z.L. detained from MGM and Mother, finding there was a substantial danger to Z.L.'s physical and emotional health, there were no reasonable means to protect her without removal, it would be detrimental to Z.L. to be placed with MGM, and placement with MGM would be contrary to Z.L.'s welfare. The court expressed its concerns about MGM leaving Z.L. in Mother's care, noting Mother was unable or unwilling to contact DCFS for several hours after learning her children were with DCFS. The court ordered monitored visitation for MGM and Mother.

### D.    Mother's Initial Appearance

On July 27, 2023, Mother appeared before the juvenile court and denied the petition's allegations. The court again found that Z.L. was a child described under section 300 and maintained Z.L.'s temporary placement with DCFS. The court reiterated its order that Mother have monitored visitation.

Mother sought to have Z.L. released to her care, stating through her counsel that although the child was under a legal guardianship, "this was under [the] probate court and that [Mother] entered into an agreement with [MGM] in order for this legal guardianship to take place."

## E.  DCFS Continues Its Investigation

A social worker eventually interviewed MGM, who reported that she, Mother, and the children lived together. MGM denied any concerns about Z.L. being in Mother's care and stated, "[Z.L. is] always with her mom." MGM felt that the incident where the children ran away from Monique G.'s home was "out of [her] control," and she was not aware that Monique G. was using drugs. Contradicting Mother's statement about the sleepover happening because of house painting, MGM stated she and Mother had discussed the children going to Monique G.'s house to get their hair braided, and the plan was for the children to leave on Friday and come back Saturday evening or Sunday. MGM indicated that the children spent a lot of time at Monique G.'s home as Monique G. is a family friend and also frequently braids the children's hair.

A social worker reinterviewed Z.L., who repeated that she and her siblings had been at Monique G.'s house for two weeks before they decided to run away. She indicated that Monique G. and Greg would smoke white rocks in the children's presence and then would become angry and hit the children and later sleep for long periods of time. Z.L. stated that the children decided to run away after they tried to wake Monique G. to ask for food, but she told them to wait. Additional interviews with Z.L.'s siblings confirmed that Monique G. hit them as well.

In a last minute information (LMI) filed on September 28, 2023, DCFS reported that Mother and MGM had only visited with Z.L. and J.W. once since their removal, and that MGM did not appear to engage with Z.L. during the visit. DCFS had arranged transportation for Mother to have another visit, but Mother failed to return calls and text messages to coordinate transportation; MGM also did not respond to attempts to arrange another visit. DCFS also reported that the foster mother complained that Mother called her home on several occasions at 3:00 a.m. asking to speak with the children. DCFS indicated that MGM had expressed interest in participating in services, and had been taking a parenting class and seeing a therapist through her health plan. DCFS reported that Mother had not participated in any services, citing transportation issues and lack of DCFS assistance, although when pressed she acknowledged that social workers had contacted her with offers to assist.

In an LMI filed on October 3, 2023, DCFS relayed that MGM had stated Mother was in the process of moving out of the home.

In an LMI filed on October 4, 2023, DCFS conveyed a report from the foster care mother that Z.L. and J.W. became upset when Mother began crying during a phone call, and Mother told J.W. he "needs to complain a lot," prompting the foster mother to end the call. DCFS also indicated that it had attempted to have Mother submit to drug testing given her erratic behavior, but Mother refused.

In an LMI filed on October 16, 2023, DCFS reported, based on comments by the foster parents, that Mother was encouraging J.W. to complain and to run away from the foster home, and brought up case matters on calls with Z.L., which prompted Z.L.

10

to tell Mother "we're not supposed to talk about that." In addition, DCFS believed that Mother was attempting to find out where the children were placed.

In an LMI filed on November 7, 2023, DCFS reported that MGM typically called Z.L. once per week and the caregiver reported no concerns. DCFS also reported that MGM continued to attend parenting classes and receive counseling.

## F.    Adjudication

The juvenile court held an adjudication hearing as to Z.L. on November 8, 2023. Mother and MGM were represented by counsel but were not present. DCFS requested the court sustain the petition, introduced into evidence the various reports it had filed, and requested the court take judicial notice of its findings and orders (including the sustained petition) in related dependency proceedings concerning Z.L.'s siblings. Z.L.'s counsel also asked the court to sustain the petition as to both MGM and Mother, noting that neither called to check on the children while they were at Monique G.'s home, and Mother did not contact DCFS for several hours after learning what had happened.

MGM's counsel argued the court should not sustain the petition because there was no current risk to Z.L. Mother's counsel argued the petition was "improperly pled against [M]other" because Z.L. was under a legal guardianship and Mother did not have physical custody of the child. Alternatively, Mother's counsel contended that Mother's plan was appropriate based on what she knew about Monique G., and "she was trying to repeatedly have contact with the children."

In rebuttal, DCFS noted that it was undisputed Monique G. had abused the children and failed to adequately supervise them. DCFS also noted that the children had been left at Monique G.'s

11

house with inadequate clothing and in a state of poor hygiene. DCFS contended that MGM, despite being the legal guardian, relied on Mother to care for Z.L., and had not visited Z.L. since August 2023. Lastly, responding to Mother's argument the petition was improperly pleaded against her because MGM was the legal guardian, DCFS asserted that there was a present risk because if the legal guardianship was dissolved custody would revert to Mother.

The juvenile court sustained the petition, finding that Z.L. was a child described in section 300, subdivisions (b)(1)(A) and (j), declared Z.L. a dependent of the court, and placed her under DCFS supervision. The court found by clear and convincing evidence under section 361, subdivision (c) that it was reasonable and necessary to remove Z.L. from MGM's and Mother's custody, it would be detrimental to Z.L. to return her to MGM or Mother, and DCFS had made reasonable efforts to prevent removal. The court ordered DCFS to provide reunification services to MGM, but not to Mother; the court ordered monitored visitation for MGM and Mother.

Mother timely appealed the court's jurisdictional findings. MGM did not file an appeal.

## DISCUSSION

### A.    Mother Has Standing to Appeal

DCFS contends that Mother lacks standing to appeal because she did not have legal custody as MGM is Z.L.'s legal guardian. We reject this contention because Mother's parental rights have not been terminated, and thus she still has a protectable legal interest at stake in the dependency proceedings.

"Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a

12

decision may appeal.  [Citations.]  An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236; see *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 948 [in order to have standing to appeal "a party must have a legally cognizable interest that is injuriously affected by the [lower] court's decision"].)

MGM was appointed as Z.L.'s legal guardian under the Probate Code.  Thus, MGM is responsible for the care, custody, and control of Z.L. (Prob. Code, § 2541, subd. (a)), and Mother's "parental rights are completely suspended for the duration of [the] probate guardianship" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1124).  However, the establishment of a legal guardianship does not terminate parental rights; other proceedings are required for that to occur.  (*Ibid.*; see, e.g., Prob. Code, § 1516.5 [providing the guardian of a child can petition to terminate parental rights in order to adopt the child].)  A legal guardianship under the Probate Code can terminate upon a court order, among other events.  (Prob. Code, §§ 1600, subds. (a) & (b), 1601.)  "Probate guardianships are not initiated by the state, but by private parties, typically family members.  They do not entail proof of specific statutory grounds demonstrating substantial risk of harm to the child, as is required in dependency proceedings. [Citations.]  . . .  It is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption sought under [Probate Code] section 1516.5." (*Guardianship of Ann S.*, at p. 1122.)

13

Given that Mother's parental rights regarding Z.L. have not been terminated, and it is conceivable those rights could be reinstated through future legal proceedings, Mother has a protectable interest at stake in this dependency proceeding as it could result in permanent termination of her parental rights. (See *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053 ["Until parental rights are terminated, a parent retains a fundamental interest in his or her child's companionship, custody, management and care"]; see also *In re K.C.*, *supra*, 52 Cal.4th at p. 238 [holding that a parent "has standing to appeal an order concerning [a] dependent child's placement . . . if the placement order's reversal advances the parent's argument against terminating parental rights"].)  Accordingly, Mother is aggrieved by the juvenile court's order and has standing to appeal.

## B.    Standard of Review for Jurisdictional Orders

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Under this standard, " 'we determine if substantial evidence, contradicted or uncontradicted, supports [the findings].  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid*.)  We will affirm a judgment if it is supported by substantial evidence "even though substantial evidence to the contrary also

14

exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' [Citations.]" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.)

## C. Substantial Evidence Supported the Juvenile Court's Jurisdictional Findings

### 1. *Applicable Law*

At the jurisdictional stage, the juvenile court must determine by a preponderance of the evidence if a child is described by section 300. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) The juvenile court here asserted jurisdiction under subdivisions (b)(1)(A) and (j) of section 300. Subdivision (b)(1)(A) authorizes dependency jurisdiction where, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child." A child is subject to the juvenile court's jurisdiction under subdivision (j) if "[t]he child's sibling has been abused or neglected, as defined in [other subdivisions of the section], and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. . . ."

Where, as here, a section 300 petition alleges multiple grounds for jurisdiction, we can affirm the juvenile court's assertion of jurisdiction if substantial evidence supports any of the alleged grounds for jurisdiction. (*In re D.P.* (2023) 14 Cal.5th 266, 283 ["the principle that '[d]ependency jurisdiction attaches

15

to a child, not to his or her parent' [citation], means that ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate" ' "].)  As we explain below, substantial evidence supported the juvenile court's assertion of jurisdiction under subdivision (b)(1)(A) of section 300 based on the conduct of MGM as Z.L.'s legal guardian and indirectly on the conduct of Mother.  We accordingly need not, and do not, address the assertion of jurisdiction based on the conduct of Mother under subdivisions (b)(1)(A) or (j) of section 300.  (*In re D.P.*, at p. 285; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.)

2.    *Substantial Evidence Supported the Assertion of Jurisdiction under Section 300, Subdivision (b)(1)(A)*

Mother contends there is no substantial evidence of a risk of future harm because there was no evidence that she or MGM had any reason to suspect that Monique G. would beat the children or use drugs in their presence.  Mother further argues there is no evidence of any continuing risk of harm "since there was no indication MGM or Mother would again leave [Z.L.] with another person and since the child would be at no risk in MGM's home."

Although section 300 requires proof that the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146), the juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; *In re Cole L.*, *supra*, 70 Cal.App.5th at pp. 601-602).  "The court may consider past events in deciding whether [the] child currently needs the court's protection." (*In re Cole L.*, at p. 602.)  A parent or guardian's

16

" '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S. O.* (2002) 103 Cal.App.4th 453, 461.)

Substantial evidence supported the juvenile court's finding that MGM's inability to adequately supervise and protect Z.L. exposed the child to a substantial risk of serious physical harm in the future. "[P]robate guardianships . . . provide an alternative placement for children who cannot safely remain with their parents." (*Guardianship of Ann S.*, *supra*, 45 Cal.4th at p. 1122.) Here, there was evidence that MGM was either unwilling or unable to fulfill her responsibility to provide such safety for Z.L. as MGM gave Mother unfettered access to Z.L. with what appears to have been no oversight. In the prior dependency proceeding, MGM failed to protect Z.L. from domestic violence involving Mother. In the present incident, MGM was aware the children were going to stay at Monique G.'s house but she did not check on the children while they were there and took no action when the children did not return home as planned. Given that Mother and MGM gave contradictory explanations about why the children went to Monique G.'s house in the first place, the juvenile court was entitled to discredit the claims by Mother and MGM that they had no knowledge of potential dangers in Monique G.'s house. Further, given Z.L.'s statements that she was at Monique G.'s for two weeks, the disheveled appearance of Z.L. suggesting she had been neglected for far longer than two days, and the lack of appropriate response when the children did not return as planned, the juvenile court was entitled to conclude the children were left with Monique G. not for the claimed sleepover but simply because MGM and Mother wanted a lengthy respite from having any responsibility to provide for Z.L.'s well-

being.  It was further reasonable for the court to infer this type of risk could occur in the future even if the children did not stay again in Monique G.'s home.

Crediting as we must for purposes of substantial evidence that Z.L. was at Monique G.'s for two weeks, we further note neither MGM nor Mother ever followed up to see how Z.L. was doing during that time.  They arranged no means for Z.L. to contact them if necessary.  They failed to provide Z.L. any change of clothes.  MGM's disregard of her responsibilities continued when she failed to contact DCFS after it took custody of Z.L. and the other children; Mother likewise delayed contacting DCFS until a day after she learned it had the children.  During the dependency proceedings, MGM and Mother only visited with Z.L. in person once.

Lastly, Mother exhibited poor judgment during her phone visits with Z.L. and J.W., including suggesting to J.W. that he run away from the foster home, which placed the children at risk.  There was also evidence that Mother called the foster home on several occasions in the middle of the night attempting to contact the children; that Mother considered this an appropriate time to speak with the children is obviously concerning.

In sum, the record discloses substantial evidence supporting the juvenile court's finding that Z.L. faced a substantial risk of harm in the future were she to be left in MGM's care, which would have likely resulted in her being in Mother's care.

Mother relies on *In re Roberto C.* (2012) 209 Cal.App.4th 1241 and *In re Savannah M.* (2005) 131 Cal.App.4th 1387, but neither case compels a different result here.  In *In re Roberto C.*, a child lost consciousness while in the care of his babysitter, was

18

taken to the hospital, and was later diagnosed with injuries suggesting non-accidental trauma. (*In re Roberto C.*, at pp. 1243-1244, 1246.) The juvenile court dismissed the case after a contested adjudication hearing (*id.* at pp. 1245-1248, 1254), and the Court of Appeal affirmed, concluding there was no evidence that the parents caused the injuries and "no evidence that provides any basis to attribute knowledge to these parents that [the child] was being abused" by the babysitter (*id.* at p. 1254). In *In re Savannah M.*, twin 19-month-old sisters were declared dependents after their parents left a family friend alone with the children while they went to the store; the parents returned to find the friend molesting one of the children.[4] (*In re Savannah M.*, at pp. 1390-1391.) The Court of Appeal reversed, concluding there was no evidence the parents should have reasonably foreseen the friend would molest their child, nor that their children were at a substantial risk of future harm. (*Id.* at pp. 1396, 1397.) The court also relied on evidence that the parents responded appropriately after learning of the molestation by confronting the friend and calling the police. (*Id.* at p. 1397.)

The case before us is distinguishable from these precedents for two basic reasons. First, there was evidence that Mother's conduct contributed to the incident at Monique G.'s house. Unlike *In re Roberto C.* and *In re Savannah M.*, what happened here did not occur during a brief interlude while the parents were away. There was evidence from which the juvenile court could

---

[4] In *In re R.T.* (2017) 3 Cal.5th 622, 628-629, our high court abrogated several cases, including *In re Savannah M.*, to the extent the cases held that section 300, subdivision (b)(1) requires a finding of parental fault or blame.

reasonably infer that Mother failed to adequately investigate whether it was safe to leave Z.L. with Monique G., that Mother failed to provide Z.L. with adequate clothing or other support when dropping her off for an extended period, and that Mother failed to check on Z.L. during the two weeks she was at someone else's house.  Second, in this case additional factors demonstrate MGM and Mother's inability to provide adequate supervision, most importantly that both failed to confront Monique G. upon learning Z.L. was missing and failed to contact DCFS upon learning the children had been found and were in its custody. MGM and Mother continued to display concerning behavior once the children were under DCFS supervision, further indicating the potential risk of future harm.

### DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.          KLINE, J.\*

_____

**\*** Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20